HOUCK *v.* BIRMINGHAM.

4-9223                                                    230 S. W. 2d 952

Opinion delivered June 12, 1950.

*Holland & Taylor,* for appellant.

*Claude F. Cooper* and *Frank C. Douglas,* for appellee.

MINOR W. MILLWEE, Justice. Appellant, R. L. Houck, owns and operates a large farm near Luxora in Mississippi County, Arkansas. He is a stockholder and director in Planters Cooperative, Inc., a cooperative organized under Act 153 of 1939 (Ark. Stats. §§ 77-1001—77-1025). The cooperative operates a cotton gin about 4½ miles from the farm owned by appellant.

Appellees are six croppers who made cotton crops on the shares for appellant in 1946 and 1947. All of the appellees made crops in 1946 and three of them also made crops in 1947.

Under the several oral crop agreements appellant was to furnish the land, equipment, tools and seed and each of the appellees was to do the work of planting, cultivating and gathering the cotton crop for which he was to receive one-half of the proceeds of the crop. As the cotton was gathered each year it was hauled to the cooperative gin by appellant, and appellees were charged $1.50 per bale in 1946 and $2.00 per bale in 1947 for their share of the hauling expense. There were other gins closer to the lands farmed by appellees, but the original charge for ginning and price paid for cottonseed by Planters Cooperative compared favorably with that charged and paid by other gins in the community.

The articles of incorporation of Planters Cooperative provide that its net income or profits, after payment of a certain dividend on preferred stock, shall be paid or credited to "patrons, members and non-members alike on a patronage basis, including such amounts as may be set aside in reserves by the vote of the directors," as prescribed in the by-laws or ordered by the board of directors. The by-laws provide that non-member patrons shall be treated the same as members and shall participate in the distribution of the earnings on the same basis. The amount, or percentage, of said patronage payments is determined by the proportion that each patron's business bears to the total business of the cooperative. In other words, if the cooperative ginned 1,000 bales of cotton in a season at a net profit of $1,000, then each patron, whether a member of the association or an outsider, would be entitled to a patronage payment of $1.00 for each bale of cotton which he delivered for ginning.

Although no formal resolution to that effect was introduced, appellant testified that at the stockholders' and directors' meeting held at the end of each ginning season in 1946 and 1947, it was decided that "patrons" would include "landlords who rented their land for part of the crop as rent, renters who rented from their landlords for cash, and renters who rented from their landlords for part of the crop," but would not include share croppers. Planters Cooperative made patronage payments to appellant for the full amount of all cotton harvested by appellees in 1946 and 1947. Appellees brought this suit against appellant and Planters Cooperative seeking recovery of one-half of said patronage payments.

Trial resulted in a decree awarding judgment in favor of each of the appellees against appellant for one-half of the several amounts of the patronage payments made to appellant for cotton produced by appellees, the total of said judgments amounting to $737.65. Since the cooperative had paid over to appellant the respective amounts found due, the complaint against it was dismissed.

The question for decision is whether the chancellor correctly held that appellees were entitled to share in the patronage payments made to appellant.

Appellant points out the legal distinction between a tenant and a share cropper under our decisions and insists that appellees had no interest in the crop which they could control; and that their 50% share of the proceeds of the crop does not include any part of the patronage payments. We do not agree with appellant in this contention. It is true, we have held that a tenant is one who pays the landlord cash or a share of the crop, or both, for the use of the land, while a cropper is one who receives a share of the crop from his employer as payment for his labor, and is merely an employee. *Barnhardt* v. *State,* 169 Ark. 567, 275 S. W. 909. In *Hardeman* v. *Arthurs,* 144 Ark. 289, 222 S. W. 20, the court quoted with approval from *Tinsley* v. *Craige,* 54 Ark. 346, 15 S. W. 897, 16 S. W. 570, where it was said: "Ordinarily when the parties occupy the relation of landlord and tenant, the title to the crop is in the tenant, and he pays the landlord rent in kind or otherwise; and in general where they occupy the relation of landlord and cropper on shares, the title to the crop is in the landlord, and he delivers a part of it to the cropper in payment of his services."

Appellees had no title to the crops until their respective one-half shares were set apart to them. *Hammock* v. *Creekmore,* 48 Ark. 264, 3 S. W. 180. Nevertheless, appellant was under a duty to divide the crops, or the proceeds thereof, with appellees. *Fenton* v. *Price,* 145 Ark. 116, 223 S. W. 364. Where a share cropper gathers the crop and turns it over to the employer-landlord to be sold, he has a cause of action against the latter for his share of the proceeds of the crop. *Hemphill* v. *Lewis,* 174 Ark. 224, 294 S. W. 1010.

A share cropper also has a contingent interest in the crop which he may mortgage. *Beard* v. *State,* 43 Ark. 284. The Laborers Lien Statute (Ark. Stats. § 51-301) has been construed to give croppers a lien on the crop grown for their labor which is superior to a mortgage

on the crop given by the employer even where the mortgage is prior in point of time. *Carraway* v. *Phipps,* 191 Ark. 326, 86 S. W. 2d 12.

The nature of the cropper's right in the crops, or the proceeds thereof, depends upon the intent of the parties as ascertained from their contract. It is undisputed that under the contractual relationship existing between appellant and appellees, the latter were entitled to receive for their services 50% of the proceeds of the crops which they produced. The question here is not one of title to crops but is whether the net proceeds of said crops include the patronage payments. If appellees had contracted for one-half the crops for their services and a division of the cotton had been made when it was gathered, and prior to ginning, appellees certainly would have been entitled to the patronage payments which are made to patrons of the gin regardless of whether they are stockholders or members of the cooperative. The mere fact that appellant hauled the cotton to the gin and made a division of the proceeds of the sale of the cotton should not work a forfeiture of appellees' right to receive their share of the patronage payments. Such payments are in reality refunds or rebates which reduce the cost of ginning to both the appellant and the appellees and thereby increase the net proceeds of the sale of the cotton.

In *Uniform Printing & Supply Co.* v. *Commissioner of Internal Revenue* (C. C. A. 7th), 88 Fed. 2d 75, 109 A. L. R. 966, a corporation was organized by a group of insurance companies to do their printing. A by-law of the corporation directed that its surplus earnings should be returned to its customers in the proportion that the gross amount of business furnished by any customer bore to the gross amount of business done by the corporation. The court held such patronage payment to be a refund, or rebate, to customers rather than a dividend and, therefore, not a part of its taxable income, saying: "Had the taxpayer given a customer (whether stockholder or outsider) a discount promptly after filling the order, no one would call it a dividend. If a rebate were given promptly upon the customer's business reach-

ing a certain volume, the same conclusion as to its character would follow. To make cost estimates and adjust them at or near the end of each year returning the excess payment to the customer should not change the reasoning which leads to this conclusion. Nor should the fact that the customer is a stockholder materially affect the result.'' The court pointed out that the amount returned to each stockholding customer was based on the business transacted and not on stock ownership.

The same conclusion was reached by the Montana court in the case of *Gallatin Farmers Co.* v. *Shannon*, 109 Mont. 155, 93 Pac. 2d 953. In that case a cooperative association distributed its net profits in the form of ''patronage dividends'' in a manner similar to the payments made in the case at bar. The court held that the patronage dividend payments constituted a rebate, or refund, to patrons which was a necessary expense of the cooperative within the meaning of a state income tax statute and, therefore, deductible from gross receipts in determining net income. In regard to such payments the court said: ''They are in no sense profits of the corporation that redound to the benefit of its stockholders. Patronage dividends are not distributed on the basis of stock ownership, but to patrons on the basis of patronage. Though the patrons be also stockholders, the allocation or distribution is not made on the basis of stock ownership but on the amount of patronage given to the corporation.'' See, also, *Anamosa Farmers Creamery Co.* v. *Commissioner of Internal Revenue*, 13 B. T. A. 907; *Midland Cooperative Wholesale* v. *Commissioner of Internal Revenue*, 44 B. T. A. 824; *U. S. Cooperatives, Inc.* v. *Commissioner of Internal Revenue*, 4 T. C. 93.

The Planters Cooperative pays no income tax because of the manner of distribution of its net earnings to customers in the form of patronage payments. These payments are not dividends similar to income ·from ordinary stock investments, but are refunds, or rebates, due all customers of the cooperative regardless of stock ownership. The making of such payments results in a refixing and reduction of the original charge for gin-

ning and a corresponding increase in the net proceeds derived from the sale of the cotton. The fact that the legal title to the cotton was in appellant does not lessen his obligation to pay over to appellees one-half of such net proceeds under the terms of their contract. In the absence of a stipulation in the contract to the contrary, appellees were, therefore, entitled to share equally with appellant in the patronage payments, and the chancellor correctly so held.

Affirmed.

McFADDIN, J., dissents.

ED. F. McFADDIN, Justice (dissenting). In this case the appellees are being awarded money that they never contracted to receive and from a source of payment that undertook to specifically exclude them. I respectfully dissent, because I cannot see that the appellees have any right to ask a court of equity to aid them in being thus enriched.

Appellees, Birmingham, *et al.*, were sharecroppers for Houck and were to receive one-half of the net proceeds from each bale of cotton and seed, just as sold. The cotton was ginned at the Planters Co-op Gin, which had a lower ginning rate and a higher price for seed than other gins. Houck settled with Birmingham, *et al.*, and thus completely and fairly fulfilled and discharged his contract with the appellees.

Then later, the Planters Co-op Gin Company delivered a patronage payment to Houck for the cotton ginned from his farm. It was given to Houck individually and not to the appellees, because the Planters Co-op Gin Company specifically excluded the appellees from being the beneficiary of the patronage payment. This is shown in the testimony that the payments would be made "to patrons of the Co-op and that patrons would be landlords who were renting their land for a part of the crop . . . and would not include . . . any sharecropper."

The witness Chester Caldwell was secretary of the Planters Co-op Gin Company; and here is his testimony:

"Q. I believe you said you were one of the original incorporators of this Co-op; has it been your impression and the general belief of all of the stockholders and directors in the forming of this Co-op and ever since that time that the sharecroppers were not classed as patrons and were not entitled to patron refunds or dividends?

"A. That is right and that information came down directly from the Bank of St. Louis. It gives us certain rules and regulations to operate under.

"Q. Does the Bank of Cooperatives in St. Louis prescribe certain rules and regulations for the conduct of their business as long as you borrow money from them?

"A. That is right.

"Q. And neither that bank, nor your board of directors, nor your stockholders' meetings have ever classed sharecroppers as producers, and have never classed them as entitled to any of these patron refunds or dividends?

"A. No, that is left up to the discretion of the man they are working for and he can do whatever he wants to as far as we are concerned.

"Q. Of course, if a man to whom you paid patron's refunds or dividends wants to give it away, endow a college, or get drunk, that is no business of yours.

"A. Entirely his business, no concern of the gin.

"Q. And the Co-op is under no obligation, legally or otherwise, to pay any of the dividends or profits to any sharecroppers?

"A. That is right."

Thus, the Court is taking money personally given to Houck by the Planters Co-op Gin Company and forcing him to give part of it to Birmingham, *et al.*, long after there had been a complete settlement of the proceeds of the crop. Anyone who wants to see the forced "redistribution of wealth" need go no further than this case.